## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

MUTUAL ASSURANCE SOCIETY
OF VIRGINIA,

        Plaintiff,

v.                                Civil Action No. 3:19cv61

FEDERAL INSURANCE COMPANY,

        Defendant.

### MEMORANDUM OPINION

This matter comes before the Court on two motions:

(1)    Defendant Federal Insurance Company's ("Federal") Motion for Summary Judgment (the "Federal Motion for Summary Judgment"), (ECF No. 9); and,

(2)    Plaintiff Mutual Insurance Society of Virginia's (the "Society") Motion for Summary Judgment (the "Society Motion for Summary Judgment"),[1] (ECF No. 11).

Federal and the Society filed Cross-Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56,[2] and both Federal and the Society responded to the Cross Motions. (ECF Nos. 13, 14). These matters are ripe for disposition.

---

[1] The Court will refer to the Federal Motion for Summary Judgment and the Society Motion for Summary Judgment, collectively as the "Cross Motions for Summary Judgment."

[2] Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[3] For the reasons stated below, the Court will grant the Federal Motion for Summary Judgment and deny the Society Motion for Summary Judgment.

## I. Procedural and Factual Background

This indemnity and contribution action arises out of a dispute between Federal and the Society as to the proper allocation of coverage liability between the insurers stemming from a wrongful death settlement.

### A. Factual Background[4]

#### 1. Wrongful Death Settlement

On November 8, 2017, a wrongful death action styled *Estate of Graham McCormick v. J. Randolph Hooper, et al.*, (the "McCormick Lawsuit") was filed in the Circuit Court for the City of Richmond (the "Richmond Circuit Court"). The McCormick Lawsuit sought "damages arising from fatal injuries suffered in a boating accident that occurred on or about August 11, 2017" and named three defendants: J. Randolph Hooper ("Rand"), the operator of the boat at the

---

[3] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). The Society is a citizen of Virginia, Federal is a citizen of Indiana and New Jersey, and the Complaint alleges damages exceeding $75,000.

[4] In recounting the factual history, the Court relates the undisputed facts as articulated in the Complaint and the Parties' briefing on both motions for summary judgment. In ruling on each motion, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In this section, however, the Court merely sets forth the undisputed facts.

time of the accident, and his parents, Gary Hooper and Lucy W. Hooper, the owners of the boat. (Compl. ¶ 7, ECF No. 1-2.)

The McCormick Lawsuit implicated the coverage of three separate insurance policies. First, GEICO Marine Insurance Company ("GEICO") issued a "marine liability policy . . . with limits of $500,000" to Gary Hooper that covered Rand Hooper as a "person . . . operating an .'insured boat' with [Gary Hooper's] direct and prior permission." (Mem. Supp. Society Mot. Sum. J. 3, ECF No. 12; GEICO Policy 19, ECF No. 1-2.) Second, the Society issued a "homeowner's policy with limits of $500,000 . . . to Rand Hooper" that provided coverage to him as the "permissive user of another's boat." (Mem. Supp. Society Mot. Sum. J. 3, 11). Third, Federal issued "a group personal excess liability policy with limits of $5,000,000" to Davenport & Company. (*Id.*) The Federal Policy "via an endorsement, lists Lucy W. Hooper as a person insured under the policy." (*Id.*) The Federal Policy covered Rand Hooper as a permissive user of the boat. (*See* Federal Policy, Mem. Supp. Society Mot. Sum. J., ECF No. 12-2.)

On April 23, 2018, the McCormick Lawsuit settled in exchange for payment of four million dollars. (*See* McCormick-Hooper Settlement, ECF No. 1-2.) In order to finalize the settlement agreement, the three insurance companies—GEICO, the Society, and Federal—agreed to contribute certain shares of the settlement subject to a reservation of rights "to pursue contribution, indemnification and/or subrogation . . . regarding each insurer's proportionate share of the Settlement Sum." (Compl. ¶ 15.) Both GEICO and the Society exhausted their coverage limits and each contributed $500,000.00. (*Id.* ¶ 14.) Federal contributed the remaining $3,000,000.00. (*Id.*)

Exercising its preserved right to pursue contribution, the Society now contends that it "paid more than its proportionate share of the settlement amount." (Compl. ¶ 2.) Specifically,

3

the Society contends that both its policy and Federal's are indistinguishable "excess" insurance policies which cannot be reconciled by the plain language of their "other insurance" clauses. The Society maintains that they should have shared liability with Federal on a *pro-rata* basis, and seeks reimbursement from Federal in the amount of $181,818.18.

## B.    Procedural History

On December 27, 2018, the Society filed suit in the Richmond Circuit Court against Federal and GEICO. On January 25, 2019, before GEICO had made an appearance in the Richmond Circuit Court, Federal removed the case to this Court pursuant to 28 U.S.C §§ 1332, 1441, and 1446. (*See* Not. Removal, ECF No. 1.)

On February 19, 2019, the Society filed a Notice of Voluntary Dismissal as to GEICO, (ECF No. 2), pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).[5] The Court dismissed GEICO, (ECF No. 3), and allowed the case to proceed against Federal. Following an Initial Pretrial Conference, Federal and the Society filed the Cross-Motions for Summary Judgment, and both Parties responded.

## II. Legal Standard

### A.    Standard of Review: Rule 56

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Liberty Lobby*, 477 U.S. at 248–50. "The interpretation of an insurance policy is a question of law that is particularly well

---

[5] Federal Rule of Civil Procedure 41(a)(1)(A)(i) allows a plaintiff to dismiss a party, without a court order, by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i).

4

suited for summary judgment." *Minn. Lawyers Mut. Ins. Co. v. Protostorm LLC*, 197 F. Supp. 3d 876, 882 (E.D. Va. 2016) (citing *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 157 (E.D. Va. 1993), *aff'd*, 48 F.3d 778 (4th Cir. 1995)).

"A fact is material if the existence or non-existence thereof could lead a jury to different resolutions of the case." *Thomas v. FTS USA, LLC*, No. 3:13cv825, 2016 WL 3653878, *4 (E.D. Va. June 30, 2016) (citing *Liberty Lobby*, 477 U.S. at 248). Once a party has properly filed evidence supporting its motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. The parties must present these in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Liberty Lobby*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

> In the end, the non-moving party must do more than present a scintilla of evidence.
>
> Rather, the non-moving party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant, for an apparent dispute is not genuine within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the facts in his [or her] favor.

*Sylvia Dev. Corp.*, 48 F.3d at 818 (internal quotations, citations, and alterations omitted). The ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted). Where the court is faced with cross-motions for summary judgment, as in the instant case, the court must review each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## B.  Insurance Contract Interpretation Under Virginia Law[6]

As with other contracts, the Court will interpret an insurance policy "in accordance with the intention of the parties gleaned from the words they have used in the document. Each phrase and clause of an insurance contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done." *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) (quoting *Floyd v. Northern Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)). "It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *Id.* (quoting *Barber v. VistaRMS, Inc.*, 634 S.E.2d 706, 712 (Va. 2006)). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.* (quoting *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 628 S.E.2d 539, 542 (Va. 2006)).

---

[6] The Parties properly assume that the Court must analyze the insurance policies pursuant to Virginia contract law. *See Klein v. Verizon Commc'ns, Inc.*, 674 Fed. App'x 304, 307–08 (4th Cir. 2017) (finding that a federal court sitting in diversity must apply the choice-of-law provisions of the state in which it sits, and that under Virginia law "lex loci contractus [or the law of the place of the contract] serves as the default rule"); *Buchanan v. Doe*, 246 Va. 67, 70–71 (1993) (finding that under Virginia state law, "the law of the place where an insurance contract is written and delivered controls issues as to its coverage").

## C.    Primary, Excess, and "Other Insurance" Clauses

Policyholders often purchase several layers of insurance coverage to best guard against

risk. Primary insurance "is typically the first layer of coverage" and generally "impose[s] on the

insurer a duty to defend, subject to the terms of the insurance contract." 23-145 *Appleman on

Insurance Law & Practice Archive* § 145.1 (2nd 2011). Excess insurance—sometimes referred

to as umbrella or catastrophic insurance—provides coverage beyond primary insurance. A "true

excess policy is triggered on the exhaustion of the limits of the primary policy." *Id.*

Because policyholders may purchase overlapping coverage, insurance policies "generally

contain 'other insurance' clauses that attempt to define the insurer's responsibility for payment

when other insurance coverage is available." *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*,

514 F.3d 327, 330 (4th Cir. 2008). These "other insurance" clauses are valid and enforceable,

and may transform a primary insurance policy into an excess insurance policy. *See* 15 Russ &

Segalla, *Couch on Insurance* § 219. As the United States Court of Appeals for the Fourth Circuit

has explained:

> [a] primary liability insurance policy that contains an excess other-insurance
> clause thus effectively operates as an excess policy if other insurance is available.
> That is, even though the policy would provide primary, first-dollar coverage for
> an insured loss if no other insurance policy covered the loss, it will provide excess
> coverage when other insurance is available. Primary liability policies with excess
> other-insurance clauses are . . . referred to as "coincidental excess" policies.

*Horace Mann*, 514 F.3d at 330 (citing *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 862

A.2d 251, 266 (Vt. 2004)).

Interpretation and application of "other insurance" clauses may become complicated

when "multiple liability policies potentially provide coverage for a given loss and each of the

policies contains an other-insurance clause." *Id.* at 331. Where two policies purport to be excess

to one another, the majority of courts, including the Supreme Court of Virginia, have found that

7

dissimilar "other insurance clauses" may be reconciled. *See Med. Protective Co. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA,* 25 F. App'x 145, 147–48 (4th Cir. 2002) (interpreting the Supreme Court of Virginia's ruling in *GEICO v. Universal Underwriters Ins. Co.,* 350 S.E.2d 612, 615 (Va. 1986)). However, if the "other insurance" clauses of two policies have the same effect, then neither provides purely primary coverage and the insurers should share contribution on a *pro-rata* basis. *See Aetna Cas. & Sur. Co. v. Nat'l Union Fire Ins. Co.,* 353 S.E.2d 894, 897 (Va. 1987) ("when other insurance clauses of two policies are of identical effect in that they operate mutually to reduce or eliminate the amount of collectible insurance available, neither provides primary coverage and . . . pro rata distribution . . . [is] appropriate.") In other words, "other insurance" or excess clauses that are "alike . . . are mutually repugnant." *Nat'l Union Fire of Pittsburgh,* 25 F. App'x at 149; *see also Horace Mann,* 514 F.3d at 331 ("some courts find conflicting other-insurance clauses to be 'mutually repugnant' and thus unenforceable and require the insurers to bear *pro-rata* shares of the total liability.")

The decision to declare two policies mutually repugnant, and thus force *pro-rata* distribution, should not be taken lightly. "Excess insurance is generally available at a lesser cost than the primary policy since the risk of loss is less than for the primary insurer." *Gabarick v. Laurin Mar. (Am.), Inc.,* 649 F.3d 417, 422 (5th Cir. 2011) (alteration and quotation marks omitted). "Permitting a primary insurer to invoke an 'other insurance' clause vis á vis an excess policy would be unfair because a primary insurer would be allowed to charge a higher premium for insuring a greater risk . . . [but] shift the loss to an excess carrier which charged a lower premium." *Am. Auto. Ins. Co. v. First Mercury Ins.* Co., 2017 WL 3575882, at *2, *10 (D.N.M. Mar. 31, 2017) (citing *Reliance Nat'l Indem. Co. v. Gen. Star Indem. Co.,* 72 Cal. App. 4th 1063, 1074 (1999)). In such a case, *pro-rata* distribution would alter "the basic rules construing

primary and excess policies," defeat the bargained for expectations of the excess insurer, and distort the insurance market. *Reliance,* 72 Cal. App. 4th at 1083.

### III. The Society and Federal Policies

**A.    The Society Policy**

The Society Policy states that it pays $500,000.00 "for the 'bodily injury' or the 'property damage' which results from the maintenance, use, loading, or unloading of a watercraft which is not owned by or rented to an 'assured' if the loss is a result of the activities of an 'assured.'" (Society Policy 14, Mem. Supp. Society Mot. Sum. J., ECF No. 12-3.) However, for all injuries arising out of the "maintenance, use, loading, or unloading of a watercraft," the Society Policy purports to be

> . . . *excess over other valid and collectible insurance that applies to the loss or claim.* (However, this does not apply to insurance written specifically to provide coverage in excess of the "limits" that apply in this policy.) If the other insurance is also excess, "we" pay only "our" share of the loss or claim.

> *With respect to all other loss or claim, if there is other insurance that applies to the loss or claim, "we" pay "our" share of the loss or claim.* (However, this does not apply to insurance written specifically to provide coverage in excess of the "limits" that apply in this policy.)

> "Our" share is that part of the loss or claim that the "limit" of this policy bears to the total amount of insurance that applies to the loss or claim.

(Society Policy 20–21) (emphases added).

**B.    The Federal Policy**

The Federal Policy defines itself as a "Group Personal Excess Liability Policy." (Federal Policy 1.) Endorsed to Lucy Hooper, the Federal Policy covered $5,000,000.00 in damages for "Family Members" and "Covered Persons." (*Id.* 2, 25.) Covered Persons are defined as "[a]ny person using a vehicle or watercraft covered under this policy with permission from you or a

family member with respect to their legal responsibility arising out of its use." (*Id.* 2) The

remainder of the Federal Policy reads, in relevant part:

## GROUP PERSONAL EXCESS COVERAGE

This part of your Group Personal Excess Liability Policy provides you or a family member with liability coverage in excess of your underlying insurance anywhere in the world unless stated otherwise or an exclusion applies.

### *Payment for a Loss*
\*\*\*

**Underlying Insurance.** *We will pay only for covered damages in excess of all underlying insurance covering those damages, even if the underlying coverage is for more than the minimum amount. "Underlying insurance" includes all liability coverage that applies to the covered damages,* except for other insurance purchased in excess of this policy.

**Required primary underlying insurance.** Regardless of whatever other primary underlying insurance may be available in the event of a claim or loss, it is a condition of your policy that you and your family members must maintain in full effect primary underlying liability insurance . . .

\*\*\*

### *Group Personal Excess Liability Coverage.*

We cover damages a covered person is legally obligated to pay for personal injury or property damage caused by an occurrence:

- *in excess of damages covered by the underlying insurance*; or
- from the first dollar of damage where no underlying insurance is required under this policy and no underlying insurance exists; or
- from the first dollar of damage where underlying insurance is required under this policy but no coverage is provided by the underlying insurance for a particular occurrence;

unless stated otherwise or an exclusion applies.
\*\*\*

### Defense coverages
We will defend a covered person against any suit seeking covered damages for personal injury or property damage that is either:

- not covered by any underlying insurance; or
- covered by an underlying policy. This will apply to each Defense Coverage as it has been exhausted by payment of claims.

**Other Insurance.** This insurance is excess over any other insurance except for those policies that

- are written specifically to cover excess over the amount of coverage that applies in this policy; and
- schedule this policy as underlying insurance

(Federal Policy 3–11) (emphases added).

## IV. Analysis

The Court will grant the Federal Motion for Summary Judgment. The Society contends that the "other insurance" clauses in the Policies are "mutually repugnant on their face" and "indistinguishable," thereby mandating *pro-rata* sharing of the coverage burden. (Society Mem. Supp. Mot. Sum. J. 1.) Because this argument overlooks the Fourth Circuit's holding in *Horace Mann* and violates well-founded principles of insurance law, the Court will deny the Society Motion for Summary Judgment.

First, the Court turns to *Horace Mann*, where the Fourth Circuit confronted a virtually identical scenario to the case at bar. Although the Fourth Circuit decided *Horace Mann* under West Virginia law, the Court finds its reasoning—and its survey of other courts—persuasive. Second, although the Supreme Court of Virginia has not yet addressed the proper method of reconciling primary and excess insurance contracts like those found in the case at bar, the Court concludes that it would likely adopt the rule articulated in *Horace Mann*. Finally, the Court will address the insurance contracts at hand. The Court concludes that the Federal Policy constitutes a "true excess policy" while the Society Policy functions as a "coincidental excess policy" which can serve as a primary policy in some circumstances. Under the rule espoused by *Horace Mann* and dozens of other courts, that designation proves determinative and precludes the Society from any recovery as a matter of law.

## A.  Fourth Circuit Precedent: The *Horace Mann* Court Looked to Whether the Insurance Policies Covered the Same Risk Before Attempting to Reconcile the "Other Insurance" Clauses

Because the Fourth Circuit's decision in *Horace Mann* presents highly persuasive authority for resolving the dispute at bar, the Court discusses that case in detail below.  514 F.3d at 331.  In that case, a West Virginia student was sexually abused by a schoolteacher. *Id.* at 328.  The resulting lawsuit against the teacher was settled for an amount in excess of $1,000,000.00.  Like here, two insurance policies—the Horace Mann Policy and a General Star Policy—contained "other insurance" provisions that each insurance company claimed were excess to the other. *Id.*

First, the Horace Mann Policy promised to pay "on behalf of the insured any and all [covered losses] subject to the limit of liability." *Id.* at 333.  It further stated that its coverage "does not apply if the insured has other valid and collectible insurance of any kind whatsoever whether primary or excess," and that "[t]his policy is specifically excess over coverage provided by school district or school board errors and omissions or general liability policies purchased by the Insured's employer." *Id.* at 332.  The General Star Policy, in contrast, stated that "[i]f other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this Policy . . . the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance." *Id.* at 331.

The district court treated the dispute as a "straightforward other-insurance clause case." *Id.* at 332.  Because the General Star policy "contemplated that it might not always be excess" while the Horace Mann policy evinced an "intention to always be excess," the district court concluded that Horace Mann did not have to contribute to the settlement. *Id.*

The Fourth Circuit rejected the district court's approach. Rather than proceed directly to an analysis of the "other insurance" clauses, as the district court had done, the *Horace Mann* court considered the total effect of each policy. The Fourth Circuit readily determined that "there is no question that General Star's policy is a *true* excess policy" as it depended on the "exhaustion of the limits of underlying primary liability insurance." *Id.* at 333 (emphasis added). The Horace Mann policy, on the other hand, lacked this "hallmark of a true excess policy." *Id.* Instead, the Fourth Circuit determined

> . . . the Horace Mann policy is a primary liability policy. The policy provides that it will pay "on behalf of the insured any and all [covered losses] subject to the limit of liability." The policy does not require that the insured maintain other insurance, and neither the declarations nor the insuring agreements limit coverage to losses in excess of the limits of an underlying insurance policy.

*Id.*[7] The Fourth Circuit recognized that the Horace Mann policy would typically act as excess insurance by virtue of its "other insurance" clause. *Id.* at 334. However, the tendency of the Horace Mann policy to provide excess insurance "simply [could not] change the fact that the

---

[7] Judge Niemeyer, writing in dissent, began by comparing the language of the "other insurance" clauses in the two policies. The Horace Mann "other insurance" clause was far broader than the Society Policy's here. It is laid out in 247 words and names various forms of education insurance that it was "specifically excess" to, including:

> coverage provided by school district or school board . . . general liability policies purchased by the Insured's employer or former employer and it is specifically excess over coverage provided by any School Leaders Errors and Omissions Policy purchased by the Insured's employer or former employer and it is specifically excess over coverage provided by any policy of insurance which purports to be excess to or recites that it is excess to a policy issued to the Insured for the benefit of members of the National Education Association.

*See Horace Mann*, 514 F.3d at 343. Despite the breadth of the Horace Mann policy's "other insurance" clause and its clear attempt to designate itself as excess insurance, the majority concluded that the Horace Mann policy lacked the hallmark of a true excess policy: requiring the existence of underlying insurance.

policy [was] written to provide primary liability insurance" and therefore could not function as a true excess policy. *Id.*

The designation of Horace Mann as the primary policy and General Star as the excess policy proved dispositive. Although West Virginia law was largely silent on the issue, the Fourth Circuit surveyed a number of cases standing for the "practically universal rule" that "a true excess insurance policy is secondary in priority to a primary insurance policy, even with respect to an incident for which the primary policy purports to make itself excess to any other available insurance." *Horace Mann*, 514 F.3d at 344. *Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 492–93 (Ind. App. 2004); *see also, Nat'l Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 884 (8th Cir. 2001); *Instit. for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 425–26 (2d Cir. 1994); *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 862 A.2d 251, 266 (Vt. 2004). Finding West Virginia law to be compatible with this virtually unchallenged authority, the Fourth Circuit concluded that the Horace Mann policy was required to exhaust its limits before General Star's true excess coverage was implicated. *Horace Mann*, 514 F.3d at 340.

Importantly, the Fourth Circuit declined to reconcile, or even analyze, the "other insurance" clauses within the insurance contracts. Because the two policies did not operate at the same level of coverage, the "other insurance" clauses were "simply . . . not relevant." *Id.* at 335. (citing *Gen. Star Nat'l Ins. Co. v. World Oil Co.*, 973 F. Supp. 943, 949 (C.D. Cal. 1997) ("when a policy is excess to another policy, there is no need to analyze the 'other insurance' clauses in either of the policies")).

## B. Virginia Insurance Law is Compatible with the *Horace Mann* "True Excess Is Always Excess Rule"

Because this case arises from diversity jurisdiction, this Court must "apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue."

*Horace Mann*, 514 F.3d at 329 (citing *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002)). The Supreme Court of Virginia has not ruled on the issue before this Court: whether courts should first determine the underlying nature of an insurance policy's coverage before turning to an analysis of any "other insurance" clause.[8] However, considering the most recent opinion of that court, and the near universal agreement with the true excess rule of *Horace Mann*, this Court predicts that Virginia law would likely follow the rule articulated in *Horace Mann*.

In *Nationwide Mutual Fire Insurance v. Erie Insurance*, the Virginia Supreme Court "determine[d] the priority of five separate insurance policies provided by Nationwide and Erie Insurance." 798 S.E.2d 170, 172 (Va. 2017). Primarily before that court were two umbrella or excess policies[9]—one covering losses for $5,000,000.00 and another covering for $1,000,000.00—both of which contained "other insurance" clauses.[10] Implicitly noting the absence of Virginia law on the subject, the Virginia Supreme Court in *Erie Insurance* adopted the reasoning of a recent decision from the United States District Court for the Middle District of Florida: *AIG Premier Insurance v. RLI Insurance Company*, 812 F. Supp. 2d 1315 (M.D. Fla. 2011). In *AIG Premier*, the federal district court mandated *pro-rata* distribution by two excess

---

[8] The Parties cite none. Indeed, an inquiry of Virginia case law does not reveal any discussion of coverage disputes between an excess insurance policy and a policy with an "other insurance" clause. Most of the Virginia Supreme Court's recent pronouncements in the area have touched upon disagreements between two primary policies.

[9] The Virginia Supreme Court used "umbrella" and "excess" interchangeably to describe policies which (1) insure catastrophic risk and (2) are covered in the first instance by a primary policy. *Erie Insurance*, 798 S.E.2d at 172. The Fourth Circuit has similarly used the terms interchangeably. *See Allstate Ins. Co. v. Am. Hardware Mut. Ins. Co.*, 865 F.2d 592, 594 (4th. Cir. 1989) (defining an umbrella policy as one that was "excess in all situations.")

[10] The factual scenario in *Erie Insurance* compared the "other insurance" clauses of two polices that constitute the functional equivalent of the Federal Policy.

insurance policies with "other insurance" clauses, dismissing any attempt to reconcile the clauses before it as a game of "semantics." *Id.* at 1323. In doing so, the *AIG Premier* court recognized the existence of true excess policies, positing that:

> [t]he [c]ourt should only depart from the ratable contribution rule when it would distort the meaning of the terms of the policies involved . . . [considering] the purpose each policy was intended to serve as evidenced by both its stated coverage and the premium paid for it. One factor indicating the intent to be excess over other excess policies, is the fact that a policy is issued as umbrella or catastrophe coverage, at rates which reflect the reduced risk insured.

*Id.* at 1324 (internal citations omitted). The *AIG Premier* court observed that "'umbrella coverages . . . are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses.'" *Id.* at 1325. Thus, *AIG Premier* aligned itself with the rule adopted by the Fourth Circuit in *Horace Mann*: some insurance policies constitute "true excess" policies even over "excess provisions arising in regular policies." *Id.*

When so deciding, the Virginia Supreme Court "adopt[ed] the reasoning of *AIG Premier*" on a closely related but ancillary issue—the effect of different terminology in an "other insurance" clause. *Erie Ins.*, 798 S.E.2d at 176. It is telling, however, that the *Erie Insurance* court explicitly adopted the reasoning of *AIG Premier*—a case which acknowledges the existence of true excess insurance policies on the *very same page* as the proposition on which the Virginia Supreme Court relied. *Id.*

Given the decision in *Erie Insurance*, it seems likely that the Virginia Supreme Court would endorse "the true excess is always excess" reasoning of *Horace Mann*. A survey of other jurisdictions strongly supports this conclusion. Federal courts have frequently been called upon to decide the exact issue in the case at bar— often in the absence of controlling or even relevant state authority—and every federal court to have done so has delineated that true excess insurance

clauses trump primary policies with "other insurance" clauses as a matter of state law.[11] *See,*
*e.g., Horace Mann Ins. Co. v. Gen. Star Nat'l Ins.* Co., 514 F.3d 327, 330 (4th Cir. 2008)
(evaluating West Virginia law); *Inst. for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d
414, 425–26 (2d Cir. 1994) (evaluating Pennsylvania law); *Philadelphia Indem. Ins. Co. v.
Emp'rs Ins. Co. of Wausau*, 703 F. Supp. 2d 41, 49–50 (D. Me. 2010) (evaluating Maine Law);
*Farmers Ins. Exch. v. Fed. Ins. Co.*, 2011 WL 13116736, at *9 (D.N.M. 2011) (evaluating New
Mexico law); *Consol. Edison Co. of N.Y., Inc. v. Aetna Ins. Co.*, 601 F. Supp. 1024 (E.D. N.Y.
1985) (evaluating New York law); *Gen. Star Nat'l Ins. Co. v. World Oil Co.*, 973 F. Supp. 943,
949 (C.D. Cal. 1997) (evaluating California law).

      State supreme courts consistently concur with the federal courts. *See, e.g., Fireman's
Fund Ins. Co. v. CNA Ins. Co.*, 177 Vt. 215, 862 A.2d 251, 266 (Vt. 2004) (Vermont law);
*Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 492-93 (Ind. App. 2004) (Indiana law);
*Nat'l Farmers Union Prop. & Cas. Co. v. Farm & City Ins. Co.*, 689 N.W.2d 619, 624 (S.D.
2004) (South Dakota law); *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.*, 494 N.W.2d 216, 218–
19 (Iowa 1992) (Iowa law); *Atkinson v. Atkinson*, 254 Ga. 70, 326 S.E.2d 206, 214 (Ga. 1985)
(Georgia law); *Rivere v. Heroman*, 688 So.2d 1293 (La. App. 1997) (Louisiana law); *Bosco v.
Bauermeister*, 571 N.W.2d 509, 519 (1997) (Michigan law). Indeed, the law has settled in this
area to a degree where one of the leading insurance treatises has stated, without qualification:

> [t]rue excess policies clearly differ in purpose from primary policies containing
> excess "other insurance" clauses, so that a prorated loss between an excess insurer
> and a primary insurer seeking excess status by virtue of its "other insurance"
> clause is improper. True excess policies are viewed as above all primary policies,
> including those with excess "other insurance" clauses.

23-145 *Appleman on Insurance Law & Practice Archive* § 145.4 (2nd 2011).

---

[11] Full cites restored to previously cited opinions for clarity.

Considering the Virginia Supreme Court's decision in *Erie Insurance* and the near-unanimous majority rule, this Court concludes Virginia would likely adopt the "true excess is always excess" rule outlined in *Horace Mann*.

### C. The Society Policy Must Be Exhausted Before the Federal Policy Because the Federal Policy Functions As a True Excess Policy

Despite its application of West Virginia law, the reasoning of *Horace Mann* drives the outcome here. Like the General Star Policy, the Federal Policy functions as a true excess policy which depends on the "exhaustion of the limits of underlying primary liability insurance." *Horace Mann*, 514 F.3d at. 333. The Society's Homeowner's Policy, on the other hand, contemplates serving as first-dollar primary liability insurance, and does not rise to the level of true excess insurance by the operation of its "other insurance" clause. Because the Society's Homeowner's Policy does not insure the same level of risk as the Federal Policy, *pro-rata* sharing of the settlement burden would be inappropriate.

### 1. The Policies' Language Indicate that the Federal Policy Was Always Intended to Be Excess Insurance While the Society Policy Provided Primary Insurance Pending the Availability of Other Insurance

The Federal Policy styles itself as a "Group Personal Excess Liability Policy." (Federal Policy 1.) Its own title labels it an excess policy. It further indicates that it will "pay only for covered damages *in excess of all underlying insurance* covering those damages" and requires policyholders to "maintain in full effect primary underlying liability insurance . . . regardless of whatever other primary underlying insurance may be available in the event of a claim or loss." (*Id.* 3.) Federal will pay "from the first dollar" of loss in two distinct situations. First, Federal will cover losses in a situation "where no underlying insurance is required under this policy *and* no underlying insurance exists." (*Id.* 4 (emphasis added).) Second, coverage will apply where

"underlying insurance is required . . . but no coverage is provided by the underlying insurance for a particular occurrence." (*Id.*)

This plain language of the Federal Policy unambiguously covers only a loss upon the exhaustion of underlying primary liability insurance for incidents involving watercraft, and thereby bears the "hallmark of a true excess policy." *Horace Mann*, 514 F.3d at 333. For instance, had an insured not carried primary liability insurance for the use of a watercraft, and no other insurance were available, then the Federal Policy by its plain terms would not apply and no coverage would be available below the $500,000.00 threshold imposed by the Federal Policy. The Federal Policy does not "drop down" to the level of primary insurance.

The Society Policy, in contrast, presents itself simply as "Homeowners" insurance and distinctly contemplates serving as primary insurance. (Society Policy 1.) Although the Society Policy contains an "other insurance" clause—making it "excess over other valid and collectible insurance that applies to the loss or claim"—it *does not require* that other insurance exist nor condition coverage upon the exhaustion of another primary policy. (*Id.* 20–21.) In the absence of another policy insuring a covered risk, Society would serve as the primary insurer, and would be obligated to provide primary coverage.

The contrast between the Policies is unmistakable. The language of the Federal Policy, unlike that of the Society Policy, does "not state that it is excess if other insurance exists:" it simply states that it is excess. *Fireman's Fund*, A.2d at 266. Because it mandates the existence of other insurance, because it conditions coverage on the exhaustion of the required insurance and other applicable policies, and because it holds itself out as excess no matter the situation, the Court finds that the Federal Policy serves as a true excess policy. The Society Policy "does not require that the insured maintain other insurance . . . [nor] . . . limit coverage to losses in excess

19

of the limits of an underlying insurance policy." *Horace Mann*, 514 F.3d at 333.  The Society

Policy attaches at the first dollar of damage and serves as a primary policy.

The level of coverage provided by the two policies also demonstrates the nature of the

policies.  The Federal Policy provided $5,000,000.00 of liability coverage.  The Society Policy

provided $500,000.00 per occurrence—just ten percent of the Federal coverage.  While not

determinative of the outcome here, the purpose of a policy may be "evidenced by both its stated

coverage and the premium paid for it." *AIG Premier Ins. Co. v. RLI Ins. Co.*, 812 F. Supp. 2d

1315, 1322 (M.D. Fla. 2011) (quoting *State Farm Fire & Cas. Co. v. LiMauro*, 482 N.E.2d 13,

17 (N.Y. 1985)).  The substantially higher ceiling five-million dollars of coverage provided by

the Federal Policy further suggests that it served as excess, catastrophic, or umbrella coverage,

while the Society Policy's limits of $500,000.00 insured ground floor risk.

### 2.    The Society's Arguments Misread the Policies and Misapply the "True Excess is Always Excess" Rule in *Horace Mann*

The Society contends that the two contracts "insured the exact same risk at the exact

same level" and therefore "[t]he two policies rise and fall in unison." (Society Resp. Mot. Sum

J. 5, ECF No. 14.)  The Society's proposed reading does not square with the plain language of

the contract.

First, the Society asserts that if the GEICO Policy were unavailable, "both the Federal

Policy and the Society Policy would be responsible for providing primary coverage for this

accident." (Society Resp. Mot. Sum. J. 5.)  The Society misreads the Federal Policy.  The

Federal Policy requires that the insured maintain primary underlying insurance.  If the GEICO

Policy had not covered the risk, Federal would only be held "liable in *excess of the foregoing*

*minimum amounts* and to no greater extent with respect to coverages amounts and defense costs

than we would have been had this failure not occurred." (Federal Policy 4 (emphasis added)).  In

the absence of underlying insurance from any other provider, Federal would have only provided coverage above their minimum policy requirements—in this case, the $500,001.00 dollar. The Society's Homeowners Policy, as discussed, would then provide first-dollar coverage.

Second, the Society submits that Federal has undertaken a duty to defend against "any suit seeking covered damages," thereby placing the Federal Policy in the role of primary insurance. (Society Resp. Mot. Sum. J. 3.) Although the Federal Policy invokes a duty to defend in certain circumstances, the Society does not clarify why a duty to defend undermines the function of a true excess policy. Nor can they. Insurance companies generally undertake a duty to defend to "assure[] that the defense will be conducted by counsel of the insurer's choosing." 22-136 *Appleman on Insurance Law & Practice Archive* § 136.1. "The effect of this provision is to give the insurer full control over the defense of the claim and control over the settlement process." *Id.* Like any primary insurer, excess insurers possess a vested interest in limiting their liability by defending an action with their counsel of choice. Federal's willingness to protect its own interests cannot reasonably be viewed as evincing a willingness to serve as a primary policy.

Third, the Society unsuccessfully contends that it operates at the same tier of coverage because its policy was "not required underlying insurance as defined in the Federal Policy." (Society Resp. Mot. Sum. J. 6.) Specifically, the Society correctly points out that Rand Hooper was insured as a "covered person" and not a "family member" under the Federal Policy. Therefore, Rand was not required to possess underlying insurance under the terms of the Federal Policy. Because the GEICO Policy provided primary coverage in this case, the Society reasons that the remaining policies must both be excess to the GEICO Policy and mutually repugnant.

Again, the Society offers a strained reading of the Federal Policy which unambiguously states that it provides coverage in excess of "underlying insurance" including "all liability coverage that applies to the covered damages." (Federal Policy 3.) The fact that Rand Hooper was a "covered person" and not a "family member" makes no difference. By the terms of the Federal Policy, the Society's coverage provided underlying insurance—required or not—and fell under the Federal excess insurance. The Society points to no rule saying that a true excess policy can only be excess to the *required* underlying insurance. For example, in *Horace Mann*, the General Star policy did not explicitly name the Horace Mann policy as underlying insurance. Nonetheless, the Fourth Circuit found that the Horace Mann policy fell under the true excess General Star policy. The same priority order applies here.

Fourth, the Society contends that the two "first-dollar" exclusions in the Federal Policy render it a primary policy. As noted above, Federal covers losses in a situation "where no underlying insurance is required under this policy *and* no underlying insurance exists" and where "underlying insurance is required . . . but no coverage is provided by the underlying insurance for a particular occurrence." (Federal Policy 4) (emphasis added). These first-dollar exclusions do not alter the fundamental nature of the Federal Policy.

The first "first dollar" exclusion refers to "Extra Coverages" in the Federal Policy which allows recovery from certain expenses resulting from identity fraud, kidnapping and reputational harm.[12] In the event the insured incurs damages from those occurrences, the Federal Policy pays

---

[12] For these first-dollar exclusions, the Federal Policy states that it "will pay up to a maximum of $100,000 for kidnap expenses you or a family member incurs solely and directly as a result of a kidnap and ransom occurrence." (Federal Pol. 7.) Similarly, the Federal Policy covers "identity fraud expenses, up to a maximum of $25,000, for each identity fraud occurrence" as well as "reasonable and necessary fees or expenses that you or a family member incur for services provided by a reputation management firm . . . [up to] $25,000." (*Id.* 6, 8.)

out first-dollar primary coverage in specified amounts. These "Extra Coverages" thus cover rare risks which would not normally be covered by primary insurance and are in keeping with the Federal Policy's excess status, and importantly, in keeping with the low premium paid for the Federal Policy. (*See* Federal Pol. 6.) Furthermore, the Federal Policy clearly indicates that this first-dollar coverage is separate from the other coverage provided in excess of required underlying insurance for motor vehicles and watercraft by placing it in an "Extra Coverages" section and exempting those extra coverage areas from the primary insurance requirement list. (*Id.* 3–4.) The Society points to no authority indicating that an otherwise purely excess policy becomes primary insurance in *every* circumstance because it provides "gap-filler" insurance for rare risks. Finally, this exclusion applies only where no underlying insurance exists. The Federal Policy thus still purports to remain excess over all other insurance.

The second "first dollar" exclusion is similarly compatible with the Federal Policy's status as excess insurance. If, for whatever reason, there exists a gap between an "occurrence" as defined by the underlying insurance and the Federal Policy, the Federal Policy assumes the risk of that failure. (*See* Federal Policy 3) (providing coverage where "underlying insurance is required . . . but no coverage is provided by the underlying insurance for a particular occurrence.") Federal's coverage still depends on the exhaustion of underlying insurance, but provides an added protection in the unlikely event that the policy holder abided by the terms of the contract but was not covered.

## V. Conclusion

The heart of the Society's argument posits that "the 'other insurance' provisions in the Society Policy and the Federal Policy are both 'excess clauses" meaning the 'other insurance' clauses are mutually repugnant." (Society Mem. Supp. Mot. Sum. J. 10.) The Society's

23

argument improperly focuses on discrete subsections of the Policies rather than the effect of the Policies as a whole. Both Polices undoubtedly carry "other insurance" clauses, but that does not render the Policies of equal effect. The Court should not immediately direct its attention to a small portion of the contract, and determining the language in those portions to be equivalent, declare the contracts as a whole to be equivalent as well. Rather, the Court must first determine the "nature of the insurance coverage provided by the policies." *Horace Mann*, F.3d at 335.

The Court recognizes, as the Fourth Circuit did in *Horace Mann*, that given Virginia law regarding watercraft insurance, in most situations the Society Policy "will in fact operate as excess coverage."[13] 514 F.3d at 334. Indeed, had the McCormick lawsuit settled for below $500,000.00, the Society Policy would have been considered excess to the GEICO Policy, which contained no "other insurance" clause. In that circumstance, the Society would not be required to contribute to the settlement. However, that the "other insurance" clause "works to reduce [the Society's] exposure in most cases" does not change the basic nature and function of the Society Policy. *Id.*

The Federal Policy functions as a true excess policy. Its coverage hinges on the exhaustion of underlying insurance. The Society Policy, while it contains language purporting to

---

[13] In Virginia, the General Assembly requires that all watercraft carry a primary insurance policy, and further mandates that primary insurers are not allowed to attempt to share this burden through an "other insurance" clause. *See Cont'l Ins. Co. v. State Farm Fire & Cas. Co.*, 380 S.E.2d 661 (Va. 1989) (finding homeowners policy excess to a yacht policy because "other insurance" clause of the yacht policy was invalid under Va. Code § 38.2-2204). It would make abundant sense for Virginia homeowner's insurance policies, like the Society Policy here, to carry an "other insurance" clause in order to limit watercraft liability because it would always be excess over statutorily mandated policies which are forbidden from 'fighting back'.

Although the Society Policy will always be excess over the statutorily required primary insurance, it does not follow that the homeowner's insurance in the Society Policy will be excess on the same level as a true excess or umbrella policy. The Federal Policy insured a different level of risk than a traditional homeowner's policy, regardless of whether that homeowner's policy made itself excess in some circumstances.

be excess to all other insurance, contemplates providing first-dollar coverage for the type of damages sustained here. By its nature, it functions as a primary policy with an "other insurance" clause—not a true excess policy. Because the two policies operate at different levels of coverage, the Court need not analyze the "other insurance" clauses, as they bear no relevance to the issue at bar. Under the rule in *Horace Mann*, the Society Policy must exhaust itself before the Federal Policy becomes implicated. Accordingly, the McCormick Settlement properly distributed the insurance available.

For the foregoing reasons, the Court will grant the Federal's Motion for Summary Judgment and deny the Society's Motion for Summary Judgment.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Date: January 15, 2020
Richmond, Virginia